**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **GAYLE KILLILEA DUNNE,**<br>**Plaintiff,** | : | **CIVIL ACTION NO.**<br>**3:13-cv-01075 (VLB)** |
| **v.** | : | |
| **SEAN DOYLE, DENISE CAMPION, JDDC CONSTRUCTION, INC., and LIGHTHOUSE MANAGEMENT, LLC d/b/a LIGHTHOUSE MANAGEMENT SERVICES,**<br>**Defendant.** | : | **July 28, 2014** |

**MEMORANDUM OF DECISION GRANTING**
**DEFENDANT'S MOTION TO DISMISS [Dkt. #23]**

## I. Introduction

**The Plaintiff, Gayle Killilea Dunne, a resident of Greenwich, Connecticut, brings this action for monetary damages, an accounting and inspection of JDDC's books and records against Sean Doyle ("Doyle"), Denise Campion ("Campion"), JDDC Construction, Inc. ("JDDC") (collectively the "JDDC Defendants") for breach of the JDDC Shareholders Agreement by and between the Plaintiff, Doyle and Campion; and for breach of contract against Lighthouse Management, LLC d/b/a Lighthouse Management Services ("Lighthouse"). Lighthouse moved to dismiss the complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and, in the alternative, for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the Defendant's Motion to Dismiss is GRANTED**

## II. Background

**The following facts and allegations are taken from the Plaintiff's Complaint and other supporting materials. [Dkt.#1, Complaint]. The facts recited in the Complaint are deemed to be true for purposes of this motion. The Plaintiff is an Irish citizen who resides in Greenwich, Connecticut, and Lighthouse is a New Jersey limited liability company that has no place of business in Connecticut. [*Id.* at ¶¶ 1, 5]. Lighthouse is a consulting company that administers funds for construction sureties and contracts.[1] [Dkt. #23-2, Declaration of Scott Adams in Support of Defendant Lighthouse's Motion to Dismiss, ¶ 5]. JDDC is a construction company operating in and around New York City. [Dkt. #1, ¶ 8]. Doyle and Campion, as principal shareholders of JDDC, represented to the Plaintiff that all of JDDC's shares were held in Campion's name, but that the majority of the shares held in her name were actually held in trust for Doyle. [*Id*. at ¶ 10]. Doyle also revealed that he established this corporate structure so that JDDC could hold itself out as a "minority owned" business in order to qualify for various projects as a minority contractor. [*Id*. at ¶ 10].**

**In the Spring of 2012, Doyle and Campion represented to the Plaintiff and her representative, which appears to be her husband, that JDDC had been**

**[1] As a condition to issuing payment and performance bonds for construction contractors, sureties sometimes require contractors to assign its rights to payment to Lighthouse, as an agent of the surety and the contractor, to collect and disburse funds during the course of the project. This arrangement, known as "funds control," is intended to ensure compliance by the contractor with applicable laws governing the disbursement of funds on construction projects, and to protect the surety by reducing the risk of claims against the surety bonds based on improper application of contract funds. [Dkt. #23-2, Declaration of Scott Adams in Support of Defendant Lighthouse's Motion to Dismiss, ¶ 6].**

**engaged to perform the renovation of a boardroom at the Fashion Institute of Technology ("FIT") in New York (the "FIT Project") and was positioned to be awarded several other contracts. [*Id*. at ¶ 11]. Doyle and Campion sought to have the Plaintiff loan them money and/or invest money with them to help JDDC fund its work on the FIT Project and grow JDDC's business. [*Id*. at ¶ 12]. Doyle and Campion represented to the Plaintiff and her husband that JDDC was likely to make profits of 20% or more on the FIT Project, based on similar projects done in the past, provided they could secure financial resources to obtain a bond and fund the start-up of the project. [*Id*. at ¶¶ 13, 14]. To further induce the Plaintiff to loan money to JDDC and to invest funds in JDDC, Doyle and Campion represented to the Plaintiff and her husband that JDDC had secured bonding by collateral that was posted from a third party in connection with the bonding requirement on a previous project related to the Haft Auditorium, and that the third party was going to make a very substantial profit in connection with the Haft Project. [*Id*. at ¶ 15].**

**Doyle, Campion, and the Plaintiff entered into the Shareholder Agreement on June 15, 2012, whereby, according to the Plaintiff, Doyle and Campion promised to convey to her 50% of the shares, control, and profit of JDDC in consideration for the Plaintiff's agreement to fund a performance bond for the FIT Project. [*Id*. at ¶ 16]. Doyle continued to represent that Campion held all of the shares of JDDC in her own name, even though a majority of those shares were held for Doyle's benefit. [*Id*. at ¶ 17]. The Shareholder Agreement allegedly resulted from negotiations between Dunne, Doyle and Campion, which occurred**

**primarily in Connecticut, and was finalized and entered into by the Plaintiff in Connecticut. [*Id*. at ¶ 18]. The Shareholder Agreement contemplated that the Plaintiff would contribute a $978,288 as cash bond for the FIT Project. [*Id*. at ¶ 19; Exhibit A, Agreement]. Doyle represented to the Plaintiff, however, that he would attempt to negotiate a lower bond amount. [*Id.* at ¶ 19].**

**The Complaint alleges that the Plaintiff, Doyle, and Campion agreed that any disbursements from JDDC's checking account in excess of an amount to be agreed upon by the parties would require the signature of both Doyle and the Plaintiff. [*Id*. at ¶ 24]. The Shareholder Agreement provides "[b]ank signatures for checks over a certain sum to be agree [sic] by the shareholders." [*Id*. Exhibit 1 ¶ 17]. After executing the Shareholder Agreement, Doyle advised that FIT would not accept a cash bond and would require a standard bond from a known bonding company. [*Id*. at ¶ 26]. Doyle then successfully negotiated with Lighthouse to provide such a bond in exchange for JDDC providing a cash collateral for the bond in the amount of $250,000. [*Id*. at ¶ 26].**

**On June 14, 2012, JDDC and Lighthouse entered into a Disbursement Control Agreement ("DCA") for escrow and "funds control" services in connection with the FIT Project. The DCA, which is governed by New Jersey law, was executed by Campion, in her role as JDDC's president, and does not reference the Plaintiff. [*Id*. at ¶ 17]. The DCA provided for the manner of disbursement of funds to JDDC's contractors pursuant to New York Lien Law. [*Id*. at ¶ 14].**

**As a result of Doyle's negotiations with Lighthouse, Doyle instructed the Plaintiff to provide $250,000 to fund the cash bond with Lighthouse, and Doyle and Campion requested an additional $250,000 in operating capital for JDDC. [*Id*. at ¶ 27].**

**The Plaintiff agreed to fund the cash bond as memorialized in a June 21, 2014 Loan Agreement between the Plaintiff and JDDC. [Dkt. #1-3, Exhibit C]. The Loan Agreement was executed by Dunne and Campion on behalf of JDDC. In it, the Plaintiff agreed to loan JDDC $250,000 to be used as cash flow for the FIT project. [*Id*.]. The loan was to be repaid with interest from surplus cash flow of JDDC on or before 31st December 2012. [*Id*.]. Doyle asked the Plaintiff to fund the $250,000 loan via a bank check, which he would in turn use to pose the cash bond. [*Id*. at ¶ 28]. The Plaintiff obtained and supplied to JDDC a bank check in the amount of $250,000. Notwithstanding the Loan Agreement, the check was accompanied by a cover letter addressed to Lighthouse for delivery by Doyle and/or Campion along with the check indicating that the $250,000 as security was being provided by the Plaintiff personally and not by Doyle, Campion or JDDC. [*Id*. at ¶ 29].**

**The Complaint alleges that Doyle and/or Campion provided the $250,000 bank check to Lighthouse without the Plaintiff's cover letter and falsely represented that Doyle, Campion, and/or JDDC were funding the bond. [*Id*. at ¶ 33]. At this point, the relationship between the parties appears to have deteriorated substantially. After the Plaintiff provided the $250,000 to fund the bond and the additional $250,000 capital contribution to JDDC, Doyle and**

**Campion allegedly engaged in a fraudulent scheme to disregard the Plaintiff's interest in the FIT Project by ignoring the Plaintiff's ownership interest in JDDC, breaching the terms of the Shareholder Agreement, failing to make payments due to subcontractors, refusing to provide financial transparency and accounting disclosures to the Plaintiff, failing to adhere to provisions of the Shareholder Agreement regarding control of check writing, and making false and misleading statements and omissions to the FIT representatives with regard to the FIT Project. [*Id*. at ¶ 34].**

**In September 2012, the Plaintiff threatened to commence litigation against Doyle, Campion, and JDDC unless the funds being paid to JDDC were properly accounted for to the Plaintiff. [*Id*. at ¶ 44]. In various conferences and emails, the Plaintiff objected to monies having been released without her approval and to the failure to implement the accounting requirements set forth in the Shareholder Agreement. [*Id*. at ¶ 45]. Doyle, on behalf of himself and Campion, agreed to take steps to protect the Plaintiff's rights including by making the Plaintiff the secretary of JDDC and requiring all future payments by JDDC to be submitted to her for approval prior to disbursement. [*Id*. at ¶ 46]. During one of these meetings, the Plaintiff discovered that Lighthouse was unaware of the cover letter submitted with the FIT Project's security check. [Dkt. #27, Declaration of Killilea Dunne In Support of Plaintiff's Memorandum of law in Opposition to Defendant Lighthouse's Motion to Dismiss, ¶ 42].**

**Seeking to rectify this omission, on October 3, 2012, the Plaintiff emailed Lighthouse from Connecticut informing it that she personally provided the bond**

**for the FIT Project and requested a meeting to discuss various issues related to JDDC's operations.[2] [*Id*. at ¶ 45]. After receiving this communication, the Defendant alleges that he contacted Doyle to ask him about the Plaintiff's involvement with JDDC, and Doyle confirmed that the initial bond was supplied by the Plaintiff, but that the parties were engaged in an ongoing dispute as the Plaintiff and her husband were aggressively attempting to control the daily affairs and management of JDDC. [Dkt. #23-2, ¶¶ 25-27]. After being contacted by the Plaintiff, and discussing the matter with Doyle, Adams, on behalf of Lighthouse, agreed to meet with the Plaintiff.**

**On October 9, 2012, following the meeting between Lighthouse and the Plaintiff and/or her husband, Adams distributed an email outlining certain actions that he recommended the parties undertake in order to resolve their differences, at least for the short term, so that the FIT Project could be completed successfully and a default could be avoided. [*Id*. at ¶ 28]. It is this email that the Plaintiff alleges memorializes the October Agreement between the Plaintiff, the JDDC Defendants, and Lighthouse, which is the contract at the root of her breach of contract claim against Lighthouse. The email, in its entirety, reads as follows**

**[2] The Defendant alleges that the initial communication was in the form of a telephone call from Sean Dunne, the Plaintiff's husband, and that Dunne told the Defendant's representative and owner of Lighthouse, Scott Adams, that his wife was an owner of JDDC, and that he wanted certain information about the status of the FIT Project and the bond collateral. Dunne requested a meeting with Adams to review the status of payments on the FIT Project. Dunne claimed on that call that he and his wife were the source of the $250,000 payment posted for the bond collateral and based on this and the Shareholder Agreement, they were entitled to the information about the status of the project. [Dkt. #23-2, ¶ 24].**

**I met with Sean Doyle yesterday and with Gayle Killilea today. Based upon the meetings, I believe that it is in the best interest of everyone that the following actions be undertaken:**

1. **Sean has acknowledged that the $250,000 posted as collateral by JDDC was provided by Gayle. When the Boardroom project has been completed and the bonding company has agreed to return the collateral, the money will be given to Gayle. Sean and Gayle will work with Lighthouse to execute the documents needed to properly return the collateral.**

2. **The $14,395.48 previously deducted from the collateral account in order to pay the bond premium on the boardroom project will be returned to the collateral account from the profits earned by JDDC on the project.**

3. **Going forward, Lighthouse will require both Sean and Gayle (or her representative) to approve all disbursement requests made to Lighthouse on the Boardroom project.**

4. **Lighthouse will provide Sean and Gayle with an accounting of all receipts and disbursements on the Boardroom project from inception to date. Lighthouse will continue to provide such information to both on a monthly basis until the completion of the project and the disbursement of all funds.**

5. **Lighthouse will provide Gayle with the current balance in the account on the Haft Auditorium project, as well as a copy of the latest requisition from JDDC to the owner on the project, and no money will be distributed to JDDC from the account (but bills from project creditors will continue to be paid) until Sean and Gayle have resolved their dispute over the use of this money to the satisfaction of Lighthouse.**

6. **All parties acknowledge that the successful completion of the Boardroom project is of paramount importance to the bonding**

> > **company, Lighthouse, JDDC and its shareholders. As a result, the parties agree that they will not interfere in or hinder the progress of work on the project and that they will cooperate to achieve a successful completion.**
>
> **If anyone disagrees with these concepts or steps, please let me know at once.**

**[Dkt. 23-8, Exhibit 6].**

**As related to this October Agreement, the Plaintiff alleges that aside from the emails, "[t]here were various phone calls" between the Plaintiff, her husband, and Lighthouse that occurred while she and her husband were in Connecticut. [Dkt. #27, ¶ 49]. However, the Plaintiff only specifically details "one call" which occurred between "a representative (either Ron Wiss or Lighthouse's owner Scott Adams) from Lighthouse in New Jersey and" the Plaintiff and her husband who were in Connecticut. [*Id.* at ¶ 57]. Nowhere does the Plaintiff allege who initiated these calls.**

**In response to the October 9, 2012 email, JDDC, through Doyle, submitted objections to nearly every concept or step highlighted in Adams's email, but the Plaintiff was not copies as a recipient to this email. [Dkt. #23-9, Exhibit 7]. In response to those objections, Adams replied only to Doyle that "Sean-this hardly seems like a response that is going to say, as you say, 'get the job done and get out…'. Lighthouse and the surety are not going to arbitrate disagreements between the two parties. If the job fails and FIT calls the bond, the bonding company will finish it by using another contractor and the chips will all fall where they may but it won't be good for either party. You two really need to work this**

**out." [*Id.*]. Prior to this email, which was sent at 11:52 AM on October 10th, the Plaintiff sent Adams, copying Doyle, comments and objections to the October 9th email. [Dkt. #27-2, Exhibit 2]. One objection was to the manner in which requisitions were to be handled and payments processed; the Plaintiff demanded that no monies be released to JDDC without her explicit approval, and required that all requisitions be prepared by Andy Smyth of Bruce Shaw Partners. [*Id.*]. The Defendant responded that "when payment requisitions for either the [FIT Project] or the Haft project are submitted to Ron at Lighthouse by JDDC, we will expect that they will already have on them the approval signatures of both Sean Doyle and you. Ron Wiss will not be attempting to coordinate the joint signing of requisition authorizations from his desk." [*Id.*].**

**Despite the fact that the Plaintiff, Doyle and Campion all objected to the suggestions made by Lighthouse, Lighthouse expressly stated to Doyle that "Lighthouse and the surety are not going to arbitrate disagreements between the two parties" and that they would have to work it out themselves, that when payment requisitions for projects were submitted to Lighthouse by JDDC, Lighthouse will expect that they will already have on them the approval signatures of both Sean Doyle and the Plaintiff, that Lighthouse will not be attempting to coordinate the joint signing of requisition authorizations, and that if the job fails and FIT calls the bond, the bonding company will finish it by using another contractor. Regardless of these facts, the Complaint characterizes the October communications as an agreement.**

**Pursuant to this agreement, the Plaintiff alleges that Lighthouse would require the signatures of both Doyle and Plaintiff in order to approve all disbursement requests made to Lighthouse on the Project. [Dkt. #1, ¶ 48]. The Complaint further alleges that they agreed that "Lighthouse would provide an accounting of all receipts and disbursement on the [FIT] Project from the Project's inception to the date of the October Agreement and on a monthly basis until completion of the Project and the disbursement of all funds." [*Id.* at ¶ 49]. The Plaintiff also alleges that the October communications required Lighthouse "to provide Plaintiff with the current balance in the account on the [project] as well as a copy of the latest requisition from JDDC to the owner on the project and that Lighthouse agreed that no money would be distributed to JDDC from the account until Plaintiff and Doyle resolved their dispute as to the use of such money." [*Id.* at ¶ 50]. Finally, the Plaintiff alleges that the so called October Agreement required that the parties not interfere with or hinder progress of work on the FIT Project. [*Id.* at ¶ 51]. The Plaintiff argues that Lighthouse breached all of these clauses by continuing to release funds to JDDC without the Plaintiff's consent or approval, by failing to provide an accounting of all receipts and disbursements on the FIT Project from its inception to the date the October Agreement was signed and on a continuing monthly basis, by failing to provide the Plaintiff with the current balance in the account on the Haft Auditorium Project as well as a copy of the latest requisition from JDDC to the owner on the project, and by acting in total disregard of the Plaintiff's rights even after meeting**

**with her and entering into the October Agreement. [*Id.* at ¶¶ 110-113]. For these alleged breaches, the Plaintiff seeks monetary damages. [*Id.* at ¶ 114].**

**The Plaintiff does not allege that the Defendant attempted to perform at all under the alleged contract. Instead, the JDDC Defendants filed suit against the Plaintiff in New York state court on October 15, 2012, only five days after the alleged contract was made.**

## III. Legal Standard

**"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sarmiento v. United States*, 678 F.3d 147 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While Rule 8 does not require detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (citations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citations and internal quotation marks omitted).**

**In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted).**

**In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc*., 987 F.2d 142, 150 (2d Cir.1993); *Patrowicz v. Transamerica HomeFirst, Inc*., 359 F. Supp. 2d 140, 144 (D. Conn. 2005).**

## IV. Discussion

**The Defendant first challenges this Court's authority to exercise personal jurisdiction over it. [Dkt. #23-1, Memorandum of Law in Support of Lighthouse's Motion to Dismiss, pp. 2-12].**

### A. Personal Jurisdiction

**"When a defendant challenges personal jurisdiction in a motion to dismiss, the plaintiff bears the burden of proving that the court has jurisdiction over the defendant." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001). A plaintiff facing a Rule 12(b)(2) motion to dismiss made before any discovery only needs to allege facts constituting a *prima facie* showing of personal jurisdiction. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005); *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). A plaintiff can make the requisite factual showing through its "own affidavits and supporting materials" which the Court may review and consider. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). To establish a *prima facie* case of personal jurisdiction over a defendant, a plaintiff must satisfy a two part inquiry: "[f]irst, it must allege facts sufficient to show that Connecticut's long-arm statute reaches the defendant, and second, it must establish that the court's exercise of jurisdiction will not violate due process." *Chirag v. MT Marida Marguerite Schiffahrts*, No. 3:12CV879(SRU), 2013 WL 1223293, at *1 (D. Conn. Mar. 26 2013) (citing *Knipple v. Viking Commc'ns, Ltd.*, 674 A.2d 426, 428-29 (Conn. 1996)).**

**i. Connecticut Long-Arm Statutes**

**In diversity cases, federal courts must look to the forum state's long-arm statute to determine if and when personal jurisdiction can be obtained over nonresident defendants. *Savin v. Ranier*, 898 F.2d 304, 306 (2d Cir. 1990).**

**The Plaintiff and Defendant contest which provision of Connecticut's Long Arm Statute is applicable to foreign limited liability companies, but after the briefing on this motion closed, a Connecticut Appellate Court concurred with the weight of authority, including this Court's prior holding, that "§ 52-59b(a) is the long arm statute applicable to foreign LLCs . . . ." *Matthews v. SBA, Inc.* 149 Conn. App. 513, 549 (Conn. App. 2014) (affirming *Austen v. Catterton Partners V, LP*, 729 F. Supp. 2d 548 (D. Conn. 2010)); *see also Marlin Firearms, Co. v. Wild West Guns, LLC*, No. 3:09-cv-921(RNC), 2013 WL 2405510, at *2 (D. Conn. May 31, 2013) (the same); *Avant Capital Partners, LLC v. Strathmore Development Co. Mich., LLC.*, No. 3:12-cv-1194(VLB), 2013 WL 5435083, at *3 (D. Conn. Sept. 30, 2013) (the same).**

**Section 52-59b(a) provides that "a court may exercise personal jurisdiction over any nonresident individual, foreign partnership or foreign voluntary association . . . who in person or through an agent . . . [t]ransacts any business within the state." Conn. Gen. Stat. § 52-59b(a). The statute does not provide a precise definition of what constitutes "transact[ing] any business within the state," but the Connecticut Supreme Court has interpreted the phrase to include "a single purposeful business transaction." *Zartolas v. Nisenfeld*, 440 A.2d 179,**

**181 (Conn. 1981); *Milne v. Catuogno Court Reporting Serv., Inc.*, 239 F. Supp. 2d 195, 202 (D. Conn. 2002)(GLG). In determining whether a business transaction qualifies as purposeful, courts do not apply a rigid formula but rather balance "public policy, common sense, and the chronology and geography of the relevant factors." *Harris v. Wells*, 832 F. Supp. 31, 34 (D. Conn. 1993) (quoting *Zartolas*, 440 A.2d at 182); *see also Chirag*, 933 F. Supp. 2d at 352-53 (the same). Courts are instructed to examine the "nature and quality, rather than the amount of Connecticut contacts to determine whether there was purposeful activity." *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d 479, 490 (D. Conn. 2006) (citations and internal quotation marks omitted).**

**Because the claims arose in contract, the Plaintiff and Defendant cite the four relevant, but not dispositive, factors to determine whether a contract can serve as the basis for personal jurisdiction: (1) "whether the defendant entered into an ongoing contractual relationship with a Connecticut-based plaintiff; (2) whether the contract was negotiated in Connecticut; (3) whether, after executing a contract with the defendant, the defendant visited Connecticut to meet with the plaintiff or communicated with the plaintiff as part of the contractual relationship; and (4) whether the contract contains a Connecticut choice-of-law provision." *Nusbaum & Parrino, P.C. v. Collazo De Colon*, 618 F. Supp. 2d 156, 161 (D. Conn. 2009); *see also Chirag*, 933 F. Supp. 2d at 352. In answering these questions, Courts must consider the totality of the circumstances in arriving at a fair conclusion. *Id*.**

**First, the Plaintiff argues that the so called October Agreement constituted an "ongoing contractual relationship." [*Id.* at ¶ 47]. The Complaint alleges that an agreement was reached on or about October 9, 2012. [*Id.*]. The Complaint, however, does not explicitly allege that the agreement was oral. Although the Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion to Dismiss states that the October agreement was oral, the October 9, 2012 email, which alleges to be the memorialization of the meeting between the Defendant and the Plaintiff, has the exact same obligations as those the Plaintiff alleges were made in the October Agreement. Therefore, it appears that the Plaintiff is asserting that the October 9, 2012 email contains the terms of the contract and serves as the actual agreement.**

**The October emails reflect that Lighthouse never undertook to mediate or resolve the dispute between JDDC, Doyle and Campion, and Doyle, Campion and the Plaintiff never agreed to a specific set of terms. The JDDC Defendants objected to most of the concepts or steps in the email, and the Plaintiff objected to other terms. Lighthouse expressly stated that there was no agreement, noting after the parties both objected to Lighthouse's proposal, that neither it nor the surety were going to arbitrate disagreements between the two parties. Lighthouse further warned Doyle of the consequence of the parties' failure to reach an agreement on their own, stating that if the job fails and FIT calls the bond, the bonding company will finish it by using another contractor other than JDDC and the chips will all fall where they may but it won't be good for either party. Finally Lighthouse made it abundantly clear that the parties had not**

**reached an agreement by stating that "[y]ou two really need to work this out." [Dkt. #23-9, Exhibit 7]. Those words also made it abundantly clear that even if an agreement was reached by Doyle, Campion and the Plaintiff, Lighthouse would not be a party to that agreement and would have received no consideration for such an agreement. Instead of proceeding under the October Agreement, the JDDC Defendants filed suit against the Plaintiff only five days later, on October 15, 2012.**

**"In order for an enforceable contract to exist, the court must find that the parties' minds had truly met . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make . . . [A]n agreement must be definite and certain as to its terms and requirements. *Elec. Wholesalers, Inc. v. M.J.B. Corp.*, 99 Conn. App. 294, 302 (Conn. App. 2007). Since there was no explicit or implicit offer by Lighthouse; Lighthouse's recommendations were not accepted by Campion, Doyle, Dunne or JDDC but instead rejected by them; and their conduct did not signify their acceptance of the recommendations, there was no contractual relationship.[3] *See infra*, at pages 33-39 for a fuller discussion of**

**[3] Looking also to the merits of the breach of contract claim, one of the Plaintiff's arguments that Lighthouse breached the October Agreement is that it continued to disburse funds to JDDC absent the Plaintiff's signature of approval. [Dkt. #1, ¶ 52]. However, in response to the Plaintiff's objections to the October 9, 2012 email, Lighthouse specifically responded to her that "when payment requisitions for either the Boardroom or the Haft project are submitted to Ron at Lighthouse by JDDC, we will expect that they will already have on them the approval signatures of both Sean Doyle and you." [Dkt. #23-9]. Therefore, Lighthouse did**

**the prerequisites to the formation of a contract. As no contractual relationship was formed the first factor weighs against exercising jurisdiction.**

**Even assuming that a contract had been created, the nature and quality of Lighthouse's undertaking would not constitute purposeful activity because Lighthouse's contractual relationship was ultimately with JDDC. The contract was fully funded by JDDC, albeit with funds provided by the Plaintiff. If Doyle, Campion and Dunne had not reached an agreement, the surety would have terminated the JDDC contract and engaged another contractor to complete the project. Thus, Lighthouse was indifferent as to whether Doyle, Campion and Dunne resolved their differences. There is nothing in the record indicating that the surety would not keep Lighthouse as the disbursement manager. As such, Lighthouse's attempt to mediate the Shareholder Agreement dispute was insignificant and merely ancillary to its contract with JDDC.**

**The second factor also weighs against exercising jurisdiction. The Plaintiff alleges that the October Agreement was negotiated over "various telephone calls" and numerous "conferences." [Dkt. #27, Plaintiff's Declaration in Support of Opposition to Motion to Dismiss, ¶¶ 45, 109]. However, the Plaintiff only specifically recalls one such call, alleging that "[t]o the best of my recollection at least one call occurred between a representative (either Ron Wiss or Lighthouse's owner Scott Adams) from Lighthouse in New Jersey and my Husband Sean Dunne and me from our home in Greenwich, Connecticut." [*Id.* at**

---

**not undertake to ensure that the approval was given. The Plaintiff, therefore, has not adequately alleged how Lighthouse breached the contract.**

**¶ 57]. The remaining allegations are merely conclusory, stating that there were numerous calls and conferences related to the October Agreement. These types of conclusory allegations have been consistently held to be insufficient to sustain a plaintiff's burden on a motion to dismiss for lack of personal jurisdiction. *RSM Prod. Corp. v Fridman*, 643 F. Supp. 2d 382, 394 (S.D.N.Y, 2009) ("Nevertheless, conclusory allegations lacking factual specificity do not satisfy" the plaintiff's prima facie burden on a motion to dismiss for lack of personal jurisdiction. (citing *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184-85 (2d Cir. 1998)).**

**Furthermore, the Plaintiff has not sufficiently alleged the types of contacts with Connecticut that would show the contract was negotiated in Connecticut. Looking at the totality of her declaration, she only alleges that when meeting with the JDDC Defendants in October, she discovered that Lighthouse was unaware that the security for the FIT Project came from her; so, she requested permission from Doyle to "meet with Lighthouse . . . ." [*Id.* at ¶ 44]. Subsequent to that conversation, on October 3, the Plaintiff emailed Lighthouse informing Adams that she was the source of the bond and requested a meeting with him. [*Id.* at ¶ 45]. Thereafter, the Plaintiff alleges that Lighthouse was "made fully aware that [the Plaintiff] was a Connecticut resident," but she nowhere alleges how or when Lighthouse became aware of this. [*Id.* at ¶ 52]. Again, these conclusory allegations do not provide the factual predicate necessary to make an affirmative finding of jurisdiction.**

**Moreover, this version of the facts does not contradict the Defendant's declaration. Adams alleges that after the Plaintiff contacted him, he discussed**

**the matter with Doyle to ensure the validity of the Plaintiff's statements; then, he agreed to meet with the Plaintiff and her husband in hopes of achieving some type of reconciliation between the parties so that the FIT Project, a project in which the Defendant had a monetary interest, would advance. [Dkt. #23-2, ¶¶ 25-30]. Indeed, it is very possible that the one call that the Plaintiff remembered was the return call from Adams stating that he would meet with the Plaintiff and her husband. Therefore, there is no contradiction in the factual allegations between the parties. Here, the Plaintiff contacted the Defendant and sought his assistance in achieving a resolution to the dispute she was having with the JDDC Defendants. Then she and her husband went to New Jersey to meet with the Defendant after which Adams circulated a summary of their discussion. These allegations do not show that the Defendant attempted to reach out to the Plaintiff in Connecticut or that he was even aware that the Plaintiff resided in Connecticut. Importantly, the Plaintiff's declaration does not state who initiated the alleged "numerous conference calls" between Lighthouse and herself, and it does not say how the Defendant became aware she was a resident of Connecticut. The Plaintiff has not made any viable allegations that the Defendant reached out to her in Connecticut to mediate the Shareholder Agreement dispute. Accordingly, this favor weighs against exercising jurisdiction.**

**The third and Fourth factors also clearly weigh against exercising jurisdiction. The Plaintiff has not alleged that the Defendant was ever present in Connecticut, and has only provided proof that the Defendant sent two follow up emails to the October 9 memorialization of the meeting between the Plaintiff and**

**Defendant. As the Defendant correctly asserts, it is not sufficient for jurisdictional purposes that a defendant merely occasionally contact a plaintiff in Connecticut through email or telephone conversations. *See Bross Utils. Serv. Corp. v. Aboubshait*, 489 F. Supp. 1366, 1371-72 (D. Conn. 1980), *aff'd mem.*, 646 F.2d 559 (2d Cir. 1980). Here, there appears to not even have been an occasional contact; instead, the communications were related to the one interaction between the Defendant and the Plaintiff that was initiated by the Plaintiff in hopes of resolving her issue with the JDDC Defendants over the meaning of the Shareholders Agreement. Finally, there was no allegation that the October Agreement contains any choice of law provision.**

**Furthermore, there are no allegations that any of the Defendant's past projects with Connecticut residents or entities are still ongoing. Instead, the only allegation is that over the past six years, the Defendant has provided funding services on over 200 projects, four of which concerned construction projects in Connecticut, amounting to less than one percent of its revenue during that time. [Dkt. #23-1, pp. 8-9]. However, if there are no ongoing contractual relationships, the Defendant is not "transacting business" under the long-arm statute. *See Mitchell v. Patterson*, No. 4001501, 2005 WL 1671528, at *6 (Conn. Sup. Ct. June 21, 2005) (noting that the "transacting business" requirement is not fulfilled when "there is no evidence of an ongoing contractual relationship between the defendants and a Connecticut corporation or other entity," even though there was some evidence of past business relationships between the defendants and Connecticut entities).**

**In sum, all of the factors weigh against exercising jurisdiction over the Defendant. Even though courts are instructed not to consider these factors rigidly, the Court does look to all of the allegations made by the Plaintiff, and the conclusion is the same. The Plaintiff has not demonstrated that the Defendant attempted to engage a Connecticut resident with the hopes of conducting or transacting business in Connecticut. The Plaintiff's allegations, therefore, do not demonstrate the Defendant's "desire to connect the contract with" Connecticut. *Tatoian v. Junge*, No. 3:13-cv-1255 (VLB), 2013 WL 6195486, at *3 (D. Conn. Nov. 26, 2013) (discussing *Chirag*, 933 F. Supp. 2d at 353).**

**ii. Due Process Considerations – Minimum Contacts**

**Even assuming that the long-arm statute requirements had been met, the Court would still decline to exercise jurisdiction because doing so would violate constitutional due process principles.**

**When analyzing constitutional due process considerations, the Court must consider whether the Defendant has sufficient contact with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The purpose of this requirement is to protect "an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contact, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985). "The test to be applied in considering the reach of personal jurisdiction is whether (1) the nonresident party has created a**

**substantial connection to the forum state by action purposefully directed toward the forum state . . . and (2) the exercise of jurisdiction based on those minimum contacts would not offend traditional notions of fair play and substantial justice."** ***Id.*** **at 639.**

**The minimum contacts prong of this inquiry is analyzed both under specific jurisdiction, which exists where a state "exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum," and under general jurisdiction, which "is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts."** ***Id*****. at 640. Given the allegations in this case, the Defendant clearly has insufficient contacts for Connecticut courts to exercise general jurisdiction over it. General jurisdiction arises if a defendant's business activities in the forum have been "substantial" or "continuous and systematic," even if they are unrelated to the plaintiff's cause of action.** ***Helicopteros Nacionales de Columbia v. Hall*****, 466 U.S. 408, 416 (1984). Moreover, "[b]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test" than that applicable to specific jurisdiction.** ***Metro. Life Ins. v. Robertson-Ceco Corp.*****, 84 F.3d 560, 568 (2d Cir. 1996). In this case, the only potential argument related to exercising general jurisdiction is based on the fact that over the past six years the Defendant has provided funding services on over 200 projects, four of which concerned construction projects in Connecticut, amounting to less than one percent of its**

**revenue during that time. [Dkt. #23-1, pp. 8-9]. These facts alone are clearly insufficient to show the "systemic" and "continuous" presence in the forum that allows a court to exercise general jurisdiction over a party.**

**In *Metro. Life Ins. v. Robertson-Ceco Corp.,* the court noted that "standing alone," the defendant's $4 million in sales in the forum state over a seven year period "may not have been sufficient" to support the exercise of general jurisdiction. *Metro. Life Ins.*, 84 F.3d at 573. Similarly, in *Chaiken v. VV Pub. Corp.*, the court found that a newspaper's circulation was too insignificant in Massachusetts to permit the court to exercise general jurisdiction over it when the distribution constituted ".004% of its total circulation," or even if it were to constitute .2% of its circulation, and when the defendant never expressly aimed its actions at the forum. *Chaiken v. VV Pub. Corp.*, 119 F.3d 1018, 1029 (2d Cir. 1997). Here, the Defendant has only admitted that four of its two hundred projects in the last six years, or 2%, were with Connecticut-based construction projects, resulting in less than 1% of its revenue. Given the precedent in this Circuit, this is insufficient to constitute a systematic and continuous presence in Connecticut. Furthermore, there are no allegations that the Defendant even solicited those projects from Connecticut businesses as opposed to being solicited by those companies, as in the present matter. Therefore, there is no indication that the Defendant expressly aimed its operations at Connecticut in a manner that would permit this Court to exercise general jurisdiction. The Court, therefore, must determine if the minimum contacts requirement has been satisfied under its specific jurisdiction.**

**To exercise specific jurisdiction over a defendant, the plaintiff's action must be related to the defendant's contacts within the forum, and "the requisite 'minimum contacts' must be such that [the defendant] can 'reasonably anticipate' being haled into court in the forum state." *Vertrue Inc.*, 429 F. Supp. 2d at 495 (citations omitted); *see also Burger King Corp.*, 471 U.S. at 474 (holding that defendant must have enough contacts with the forum state so that court's exercise of personal jurisdiction over defendant's conduct in connection with the state should be reasonably foreseeable). As with determining whether a defendant has transacted business in Connecticut under the state's long-arm statutes, the minimum contacts inquiry rests upon the totality of the circumstances analysis; all of the defendant's contacts within the forum state "must indicate that jurisdiction is proper." *Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158, 166 (2d Cir. 2005). Even a single act, if it creates a "substantial connection" with the forum state, can constitute the basis for jurisdiction. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957). Most importantly for this inquiry is whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Vertrue Inc.*, 429 F. Supp. 2d at 495 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).**

**In *Estate of Martinez*, the court found that it did not have jurisdiction over an Ohio attorney who agreed to represent the Plaintiff in filing a wrongful death suit in Connecticut because he never solicited business in Connecticut and any failure to perform the contract, such as to investigate the wrongful death claim**

**and draft the necessary papers for the litigation, actually occurred in Ohio where the attorney was located, not in Connecticut. *Estate of Martinez v. Yavorcik*, 455 F. Supp. 2d 115, 122-23 (D. Conn. 2006). Similarly here, the Defendant's only connection to Connecticut relating to this dispute are the Defendant's October 9, 2012 email and follow-up communications sent from New Jersey, suggesting steps which could be taken to resolve the dispute between the parties to the Shareholders Agreement, a contract to which Lighthouse was not a party.**

**Furthermore, the October Agreement was made in response to the Plaintiff's request for a meeting with the Defendant. There are no allegations that the Defendant solicited the Plaintiff in any manner in hopes of transacting business or availing itself of the state's jurisdiction. Instead, the Defendant hoped to salvage a project in which he had a fiscal interest, by mediating the dispute between the JDDC Defendants and the Plaintiff and her husband. This Court also finds the Plaintiff's argument that the October Agreement required performance in Connecticut as unavailing. Nowhere does the Plaintiff support or even explain her allegation that the Defendant was made aware that the Plaintiff was located in Connecticut, and, even if he was, the performance of the contract, assuming there was one, was only in Connecticut. Sending various reports to the Plaintiff in Connecticut did not constitute complete performance; instead, just as performing legal services in *Estate of Martinez*, the Defendant was obligated to compile those reports in New Jersey and then send the final result to the Plaintiff. Therefore, the terms of the contract do not require complete performance in Connecticut. Furthermore, after receiving the parties' objections to the October**

**Agreement, the Defendant never attempted to perform under the contract. Therefore, no minimum contacts were actually established. *See Int'l Alliance of First Night Celebrations, Inc. v. First Night, Inc.*, 3:08-cv-1359, 2009 WL 147695, at *5 (N.D.N.Y. May 22, 2009) (declining to exercise personal jurisdiction when the "Defendant does not maintain offices, bank accounts, or employees in New york, it did not negotiate the subject contract in New York, it does not solicit business in New York, there are no allegations concerning its performance under the contract in New York, and there are insufficient allegations that Defendant otherwise engages in sufficient activities to establish minimum contacts with the State of New York.").**

**The Plaintiff relies on *Johnsen, Fretty & Co., LLC v. Lands South, LLC*, as support to argue that the Defendant in this case should have foreseen that it could be haled into a Connecticut court. In that case, the court exercised jurisdiction when**

> **the Defendants entered into the Agreements with the Plaintiff, a Connecticut company, for the purpose of selling a portion of the Defendant's businesses. Various types of communications were made to and from Connecticut. Under the agreements, the Plaintiff, which the Defendants presumably knew is a Connecticut company, was obligated to perform certain functions. It was reasonable to expect that the Plaintiff would perform its obligations in Connecticut. In addition, the Agreements specifically confer jurisdiction upon Connecticut and invoke the benefits and protections of Connecticut law.**

***Johnsen, Fretty & Co., LLC v. Lands South, LLC*, 526 F. Supp. 2d 307, 313 (D. Conn. 2007). Unlike in our case, there, the defendant initially solicited the**

**assistance of the plaintiff in Connecticut, the parties entered into an actual written contract which the plaintiff was to perform in Connecticut and the contract specifically conferred jurisdiction upon Connecticut invoking the benefits and protections of Connecticut law. *Id.* at 309. The case here is entirely different. The Plaintiff solicited the assistance of the Defendant, not vice versa; the Plaintiff was not required to perform any obligations in Connecticut, she would be just merely the recipient of reports and other items that would have been generated in New Jersey; it is not reasonable in this instance to presume that the Defendant knew the Plaintiff's location because the Plaintiff, not the Defendant, initiated the relationship; and finally, the alleged contract, the October Agreement, has no indication that Connecticut was a desired forum for any legal dispute. Therefore, *Johnsen, Fretty & Co., LLC* is materially inapposite to the present matter.**

**Accordingly, the Court finds that the constitutional requirement of minimum contacts is not present in this case, and the Court cannot exercise jurisdiction over the Defendant.[4]**

**[4] Since minimum contacts have not been found, the Court declines to continue to the second step of the personal jurisdiction inquiry, "whether the exercise of jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Vertrue Inc.*, 429 F. Supp. 2d at 495 (quoting *Burger King Corp.*, 471 U.S. at 475). It should be noted, however, that if minimum contacts are found, a defendant must present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Metro. Life Inc. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).**

**B. Failure to State a Breach of Contract Claim**

**The Defendant argues that this Court should also dismiss the breach of contract claim against it because the October 9 email did not constitute a legally binding contract. [Dkt. #23-1, pp. 13-22]. The Plaintiff responds by arguing that she has sufficiently alleged facts on a motion to dismiss that an oral agreement was made, and the Defendant breached that agreement. [Dkt. #25, pp. 30-33].**

**i. Extrinsic Evidence**

**The Plaintiff initially contests whether the Court may consider the October emails attached both by the Defendant and the Plaintiff in relation to the Motion to Dismiss. The Court, when ruling on a motion to dismiss, may only consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, or matters of which the Court may take judicial notice. *Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir. 1993); *see also Datto Inc. v. Braband*, 856 F. Supp. 2d 354, 363 (D. Conn. 2012) ("In addition, the Court may also consider 'matters of which judicial notice may be taken' and 'documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" (quoting *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 2007)). "'[W]hen matters outside the pleadings are presented in . . . a 12(b)(6) motion,' a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.'" *Friedl v. City of New***

***York*, 210 F.3d 79, 83 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir. 1988)). "This conversion requirement is strictly enforced whenever there is a 'legitimate possibility' that the district court relied on material outside the complaint in ruling on the motion." *Id.* "Thus, a district court errs when it consider[s] affidavits and exhibits submitted by defendants . . . or relies on factual allegations contained in legal briefs or memoranda . . . in ruling on a 12(b)(6) motion to dismiss." *Id.* at 83-84 (citations and internal quotation marks omitted).**

**However, "on a motion to dismiss a court may consider [certain extrinsic] materials] notwithstanding Rule 12(b)'s conversion requirement." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006). "The extrinsic evidence that the court may consider on a motion to dismiss without having to treat the motion as one for summary judgment is limited to materials that are integral to the plaintiff's complaint or materials subject to judicial notice." *Estate of Axelrod v. Flannery*, 476 F. Supp. 2d 188, 199-200 (D. Conn. 2007) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991) (holding that, for a 12(b)(6) motion, a defendant may introduce material that is "integral to the complaint," even if the complaint did not contain or reference that material, "because plaintiff should not so easily be allowed to escape the consequences of its own failure").**

**Respecting materials that are integral to the plaintiff's complaint, "a necessary prerequisite for that exception is that the 'plaintiff rel[y] on the terms and effect of [the] documents in drafting the complaint . . . ; mere notice or**

**possession is not enough.'" *Global Network Commc'ns, Inc.*, 485 F.3d at 156 (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)). In most instances, this exception is recognized where "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Id.* at 157. The primary purpose of this exception is to "prevent[] plaintiffs from generating complaints invulnerable to rule 12(b)(6) simply by clever drafting." *Id.*; *see also Matusosky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ("If a plaintiff's allegations are contradicted by [] a document [attached to or incorporated by reference into the complaint], those allegations are insufficient to defeat a motion to dismiss."); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").**

**In *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, the Second Circuit found that when a complaint is based on an alleged contract or agreement, a court may consider the contract or agreement even when the complaint does not incorporate it as long as the complaint "relies heavily upon its terms and effect." *Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam). Here, the Plaintiff alleges in the Complaint that "[o]n or about October 9, 2012, Doyle, Campion, JDDC and Lighthouse entered into an agreement in connection with the ongoing management of the" FIT Project."**

**[Dkt. #1, ¶ 47]. The Plaintiff then recites a series of obligations that are identical to those contained in the October 9 email that was attached as an exhibit both to the Defendant's motion to dismiss and the Plaintiff's opposition to that motion. [Dkt#23-8; Dkt. #27-2]. It is clear that this email was integrated into the Complaint because there is no difference between the terms in the email and in the Complaint; moreover, there can be no dispute that this email and the Plaintiff's responses and objections to the email were in the Plaintiff's possession and were relied upon by the Plaintiff in drafting the Complaint because the Plaintiff is the party that put those documents into evidence by attaching them as exhibits to her opposition to the Defendant's motion to dismiss. *See Brass*, 987 F.2d at 150. However, the JDDC Defendants' objections to the October 9 email were sent via email only to the Defendant. There has been no demonstration that these objections were in the Plaintiff's possession at the time the Complaint was drafted or that they were used in drafting the Complaint. Therefore, while the October 9 email and objections by the Plaintiff may be considered by the court, the JDDC objections to the October 9 email are extrinsic evidence and must be excluded from review.**

**ii. Choice of Law**

**The Court agrees with the Plaintiff that there is no need to conduct an in depth choice-of-law analysis because there is no outcome-determinative discrepancy between Connecticut, New Jersey, and New York with respect to a breach of contract claim. *See Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320 (Conn. App. 2010) ("'The Threshold choice of law issue in Connecticut, as it is**

**elsewhere, is whether there is an outcome determinative conflict between applicable laws of the states with a potential interest in the case. If not, there is no need to perform a choice of law analysis, and the law common to the jurisdiction should be applied.'" (quoting *Chien v. Skystar Bio Pharm. Co.*, 623 F. Supp. 2d 255, 262 n.6 (D. Conn. 2009); *Brown v. Strum*, 350 F. Supp. 2d 346, 348 (D. Conn. 2004)). Upon review of the authorities, and as the Defendant concedes, there is no discrepancy between the laws of the three jurisdictions. Therefore, the Court will apply the law common to all of the jurisdictions.**

**iii. Breach of Contract**

**In order to show a breach of contract, a plaintiff must show: the formation of an agreement; performance by one party; breach of the agreement by the other party; and damages resulting from that breach. *See Datto Inc. v. Braband*, 856 F. Supp. 2d 354, 368 (D. Conn. 2012); *accord DFP Mfg. Corp. v. Northrop Grumman Corp.*, No. 97-cv-4494, 1999 WL 33458384, at *4 (E.D.N.Y. March 23, 1999) (citations and internal quotation marks omitted); *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. App. Div. 2007). With respect to the first element, "[a]n agreement must be definite and certain as to its terms and requirements. . . . So long as any essential matters are left open for further consideration, the contract is not complete. . . . A contract requires a clear and definite promise." *Geary v. Wentworth Labs. Inc.*, 60 Conn. App. 622, 627 (Conn. App. 2000). More generally, "[t]he doctrine of consideration is fundamental in the law of contracts, the . . . rule being that in the absence of consideration an executory promise is unenforceable." *Conn. Nat'l Bank v. Voog*, 233 Conn. 352, 366 (1995).**

"Consideration consists of a benefit to the party promising, or a loss of detriment to the party to whom the promise is made . . . ." *Milford Bank v. Phoenix Contracting Group, Inc.*, 143 Conn. App. 519, 529 (Conn. App. 2013).

1. Consideration

The Defendant first argues that the October Agreement is not supported by the requisite consideration, and, therefore, is unenforceable. [Dkt. #23-1, pp. 18-19]. The Plaintiff argues that she has alleged that the "consideration" for the agreement was based on her agreement to refrain from initiating "legal proceedings," which is sufficient consideration. [Dkt. #25, p. 35]. While promises to refrain from certain activity can constitute consideration, thereby rendering an enforceable contract, the Plaintiff has not made sufficient allegations against Lighthouse to show that the consideration was in exchange for the Defendant's agreement to perform the tasks highlighted in the Complaint. The Plaintiff alleges in her Complaint that

> [i]n September 2012, Plaintiff threatened to start proceedings against Doyle, Campion and JDDC unless the funds being paid to JDDC were properly accounted for to Plaintiff. . . . In various conferences and e-mails, Plaintiff objected to monies having being released without her approval and without the accounting requirements set forth in the Agreement being implemented at the outset of the Prpject [sic]. . . . Doyle on behalf of himself and Campion agreed to take steps to protect Plaintiffs rights including making Plaintiff the secretary of JDDC and that all future payments by JDDC would be submitted to Plaintiff for her approval.

[Dkt. #1, ¶¶ 44-46]. Based on the Complaint, the Plaintiff's agreement to refrain from commencing legal proceedings was tied to the outcome of her being named

**as secretary of JDDC and that all future payments would be submitted for her approval. There is no allegation that Lighthouse was engaged in any of these discussions or played any role in brokering that arrangement. Moreover, there is nothing in the record which indicates that Lighthouse would have suffered any adverse repercussions if the Plaintiff had filed suit.**

**Subsequently, the Plaintiff alleges that "[o]n or about October 9, 2012, Doyle, Campion, JDDC, Plaintiff and Lighthouse entered into an agreement in connection with the ongoing management of the Project (the "October Agreement")." [*Id.* at ¶ 47]. As part of that agreement, the Plaintiff alleges that the Defendant "agreed that [it] would require the signature of both Doyle and Plaintiff in order to approve all disbursement requests made to Lighthouse on the Project . . .[,] provide an accounting of all receipts and disbursement on the Project . . .[,] provide Plaintiff with the current balance in the account on the haft Auditorium Project . . .[, and] further agreed that no money would be distributed to JDDC from the account . . . ." [*Id.* at ¶¶ 48-50]. The Complaint does not mention any obligation undertaken by the Plaintiff, nor does it tie the abstention from commencing legal proceedings to the October Agreement; instead the abstention to commence legal proceedings is associated with the agreement the Plaintiff made with Doyle and Campion in September 2012.**

**Looking to the October 9 email, which appears to be the October Agreement referenced by the Plaintiff and integrated into the Complaint, there is no mention of any obligation or promise by the Plaintiff except for the provision that states that 'the parties agree that they will not interfere in or hinder the**

**progress of work on the project and that they will cooperate to achieve a successful completion." [Dkt.#23-8]. However, the parties had already contracted to complete the project, and a "promise to do something which the promisor is already legally obligated to do does not constitute consideration sufficient to support a valid contract."** ***Jackson v. Water Pollution Control Auth. of City of Bridgeport*****, 278 Conn. 692, 707 n.13 (2006). Moreover, the Plaintiff has not argued that this provision constituted the consideration for the October Agreement. Finally, the Plaintiff had already funded the bond for the project. Therefore, considering that the Complaint does not reference consideration for the October Agreement and because the October 9 email does not reference any affirmative obligation of the Plaintiff or any new promise to refrain from any activity, the Plaintiff has not pled the existence of a valid, enforceable agreement. Accordingly, if the Court had jurisdiction over the Defendant, the breach of contract claim against Lighthouse would be dismissed for failure to state a claim upon which relief could be granted.**

**2. Meeting of the Minds**

**Finally, the Defendant also argues that even if the October Agreement was supported by sufficient consideration, there was no mutual assent, meeting of the minds, or certainty as to the terms. [Dkt. #23-1, pp. 19-22]. "[I]n order to form a binding and enforceable contract, there must exist an offer and an acceptance based on a mutual understanding by the parties . . . The mutual understanding must manifest itself by a mutual assent between the parties."** ***Housing Auth. v. DeRoche*****, 112 Conn. App. 355, 370 (Conn. App. 2009);** ***Fortier v. Newington Grp.,***

***Inc.*, 30 Conn. App. 505, 510 (Conn. App. 1993) ("[i]n order for an enforceable contract to exist, the court must find that the parties' minds had truly met."). "The rule requires that an acceptance mirror the offer. . . . If the offeree attempts to add to, or change, terms of the offer, this response is transformed from an acceptance into a rejection and counteroffer." *Chambers v. Manning*, 169 F.R.D. 5, 7 (D. Conn. 1996); *Briga v. D'Amico*, No. CV040083317, 2006 WL 24557, at *4 (Conn. Sup. Jan. 12, 2006) ("It is basic contract law that a change in the terms of an offer constitutes a rejection of the offer and a counteroffer." (citing *Pleines v. Franklin Constr. Co.*, 30 Conn. App. 612, 616 (Conn. App. 1993)); *see also Cavallo v. Lewis*, 1 Conn. App. 519, 521 (Conn. App. 1984) (no contract formed when plaintiffs' alteration to real estate agreement, which extended closing date, terminated their power of acceptance and functioned as counteroffer). Even so, the law**

> **does not require an express acceptance . . . Acceptance may be shown by acts or conduct indicating assent to an offer or, under appropriate circumstances, acceptance may be implied by the offeree's silence and inaction. . . . Moreover, regardless of actual intent, if the offeree's conduct leads the offeror reasonably to conclude that the offer is being accepted, acceptance has taken place as a matter of law.**

***Pleines*, 30 Conn. App. at 617 (citations and internal quotation marks omitted).**

**Here, the Defendant argues that, assuming the October 9 email constituted an offer to form a binding agreement, no acceptance was rendered because the Plaintiff rejected that offer by substantially changing the terms of the agreement and submitting a counteroffer. [Dkt. #23-1, p. 20]. As the Court previously ruled,**

**the October 9 email is appropriately considered on this motion as the Plaintiff relied on that document in drafting her Complaint. Moreover, the Plaintiff was the party that put into evidence her objections to the October 9 email. [Dkt. #27-2, Exhibit 2]. Therefore, there can be no debate that she was in possession of these documents at the time the Complaint was drafted and relied upon them when making the argument that the Defendant breached a valid and enforceable contract. Accordingly, the Court may consider these documents as well.**

**On October 10, 2012 at 9:14 AM, the Plaintiff responded to Adams, copying Doyle, thanking him for his email, but making substantial and material alterations to several of the proposed terms in his October 9 email. One proposed change modified the original term that required both Doyle and Killilea to approve all disbursement requests to "[n]o monies are to be released from [the Defendant's] account to JDDC without [the Plaintiff's] prior written approval," and that a person named Andy Smyth of Bruce Shaw Partners be responsible for preparing all future requisitions. [*Id.*]. In response to this counteroffer, the Defendant responded that he would not be involved in ensuring the appropriate signatures were made for the disbursement of funds, but would assume that any requests for disbursement sent to him had the appropriate approvals. [*Id.*]. The Plaintiff and Defendant exchanged two follow up emails to this communication chain, but neither contained a clear, unequivocal acceptance of any offer or counteroffer. More importantly, Doyle, who the Plaintiff also alleges was party to the agreement, never responded to this chain, meaning, he never explicitly accepted the offer either. So, the documents that the Plaintiff has provided in support for**

**her claim that Doyle, Campion, JDDC, Lighthouse, and the Plaintiff formed an agreement show that no contract was actually formed because there was no clear acceptance by the parties as to the material terms of the agreement; therefore, there was no mutuality or meeting of the minds. Furthermore, there can be no allegation of acceptance by action because in this case, there is no allegation that any party performed under the contract. On the contrary, the JDDC Defendants filed suit against the Plaintiff five days later. Accordingly, the Plaintiff has not sufficiently pled a breach of contract claim against Lighthouse on either a theory of lack of consideration or lack of mutuality and acceptance.**

## V. Conclusion

**For the foregoing reasons, the Defendant's [Dkt. #23] Motion to Dismiss for lack of personal jurisdiction is GRANTED.**

**IT IS SO ORDERED.**

**/s/**
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: July 28, 2014**